|  | IN THE CIRCUIT COURT OF THE |
|---|---|
| | 11TH JUDICIAL CIRCUIT IN AND FOR |
| JESUS FERNANDEZ, JR., | MIAMI-DADE COUNTY, FLORIDA |
| | |
| | CIRCUIT CIVIL |
| Plaintiff, | CASE NO.: 2017-021496-CA-01 |
| v. | |
| | |
| JERRY FALWELL, JR., et al., | |
| | |
| Defendants. | |
| _____/ | |

**Defendant Jerry Falwell, Jr.'s Notice of Filing Affidavit**
**in Support of Motion to Dismiss for Lack of Personal Jurisdiction**

COMES NOW Defendant, Jerry Falwell, Jr., by and through undersigned counsel, hereby

gives notice of filing the attached affidavit of Jerry Falwell, Jr., in support of his previously filed

motion to dismiss for lack of personal jurisdiction (attached hereto as **Exhibit A**).

Respectfully submitted December 4, 2018.

ALLEN, DYER, DOPPELT + GILCHRIST, PA
1221 Brickell Avenue, Suite 2400
Miami, FL 33131
Tel: (305) 374-8303

BY: ___*/s/ Joshua B. Spector*_____
Joshua B. Spector, Esq.
Fla. Bar. No. 0584142
jspector@allendyer.com

CASE NO.: 2017-021496-CA-01

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2018, the undersigned electronically filed the foregoing with the Clerk of the Courts by using the ECF system which will send a notice of electronic filing to counsel of record.

Rolando A. Diaz
Fla. Bar No. 963150
rdiaz@DLG-lawyers.com
mail@DLG-lawyers.com
DIAZ LAW GROUP
Dadeland Centre I
9155 S. Dadeland Blvd., Suite 1218
Miami, FL 33156
Telephone: (305) 777-3500

BY: __*/s/ Joshua B. Spector*_____
Joshua B. Spector, Esq.

# Exhibit A

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL

CASE NO.: 2017-021496-CA-01

JESUS FERNANDEZ, JR.,

     Plaintiff,

v.

JERRY FALWELL, JR., et al.,

    .........Defendants.........................../

### Sworn Affidavit in Support of Motion to Dismiss for Lack of Personal Jurisdiction

COMMONWEALTH OF VIRGINIA      ]
                                      ]
COUNTY OF BEDFORD                 ]

     Before me, the undersigned authority, personally appeared Jerry Falwell, Jr., who was sworn and stated:

     1.     I am a resident of Bedford County, Virginia, and a citizen of the United States.

     2.     I am over the age of majority.

     3.     This affidavit is made based on my personal knowledge.

     4.     I have reviewed and am familiar with the allegations made in the above-captioned lawsuit.

     5.     During the events alleged in Mr. Fernandez's pleading, I did not have continuous and systematic contact with the State of Florida.

     6.     I have traveled to Florida on a few occasions over the last several years, and that travel always involved vacation with my family. I detail those trips below.

     7.     Currently, and at all times pertinent to Mr. Fernandez's allegations, my time is and has been dominated by my role and responsibilities as the president of Liberty University, a post that I have held since 2007. The job description for that post is as follows:

The Chancellor/President is appointed by the Board of Trustees and is the Chief Executive Officer of the University. The Chancellor/President is vested with all authority, powers, duties and responsibilities incident to the management and control of the University to further its interests, including the authority to enter into contracts and transact business in the name of the University, including the power to purchase, receive, accept, reject, convey, grant, exchange, trade, partition, release, lease, sublease, contribute, donate, secure, encumber, pledge and otherwise develop, grant and dispose of the assets, real property and other property interests of the University. The Chancellor/President, whose primary responsibility is to the institution, shall serve as a member of the Board of Trustees but not serve as its Chairman. The Chancellor/President shall see that all Board policies and resolutions of the Board are administered and implemented under his general supervision. The Chancellor/President is responsible for the adoption of administrative policies, rules and regulations that govern the day to day operations of the University, clarify the roles and responsibilities of administrators, staff, faculty and students relating to a specified subject matter, or provide guidance on procedural matters. In addition to the foregoing, the Chancellor/President shall be responsible for providing focus and direction for the University and for making Board policy recommendations to the Board of Trustees. The Chancellor/President shall represent the University and shall be responsible for implementing the mission of the University. The Chancellor/President, or his designee, shall preside over and coordinate all meetings and official convocations of the University, including student and faculty convocations. The Chancellor/President is also the principal liaison between Thomas Road Baptist Church and Liberty University. He provides spiritual and worldview leadership to the University in the pursuit of excellence. The Chancellor/President, in addition to the duties and responsibilities set forth herein, shall have ultimate responsibility for, and exercise appropriate administrative and fiscal control over, the institution's intercollegiate athletics program, and shall also be directly responsible for recruiting students and soliciting contributions to support the University. The Chancellor/President may delegate any of his powers to such other officers of the University as he may deem appropriate. The Chancellor/President shall make an annual report to the Board of Trustees of the work, condition, and needs of the University as well as any other matters that may affect the University as it pursues the fulfillment of its mission. The policy and procedure for evaluation of the Chancellor/President is detailed in Article IV, Section 2.

8.      Prior to accepting the position as president of Liberty University, I practiced law for approximately 20 years. A significant component of my legal practice regarded real estate development and transactions. In addition to practicing law, I have also participated in real property development projects but have done so as a passive investor.

9.      I do not own, and have never owned, any real property in Florida.

10.     I neither own nor rent any homes outside of Bedford County, Virginia.

11.     I do not own, and have never owned, any portion of a Florida business.

12.     I am not involved in the day-to-day operation of any Florida business.

13.     I am not, and have never been, a manager, officer, director, or executive of a Florida business.

14.     I do not have any family residing in Florida.

15.     I have never had a post office box in Florida.

16.     I have never had a Florida telephone number.

17.     I have never had any banking relationships in Florida.

18.     I have never had a local or state license in Florida.

19.     I would be severely prejudiced if I am forced to defend myself in the State of Florida, and object to the assertion of jurisdiction over my person.

## Comeback Inn, LLC

20.     I am familiar with Comeback Inn, LLC. I am not, and have never been, a member of Comeback Inn, nor have I had any equity interest in that company. I have never held a direct or indirect equity or ownership interest in Comeback Inn.

21.     Comeback Inn is a Virginia company that invests in real property development projects.

22.     I am not, and have never been, an officer, director, executive or manager of Comeback Inn.

23.     It is not, as Mr. Fernandez alleges, a Florida limited liability company. To my knowledge, Comeback Inn has never engaged in business in Florida.

24.     While in Florida on two family vacations, I did advise and assist Comeback Inn in evaluating properties in Florida, but did so as an informal advisor.

25.     I met with Mr. Jesus Fernandez, Jr. ("Mr. Fernandez") and/or his father, Jesus Fernandez, Sr., on two occasions.

26.     During a family vacation to Florida, Mr. Giancarlo Granda introduced me to Mr. Fernandez and/or his father in the lobby of the Loews Miami Beach Hotel in Miami Beach, Florida. There was talk in principle where these gentlemen urged investment in a Miami-based youth hostel. This short meeting in the hotel lobby did not result in any agreement. It follows that I did not make any of the alleged promises or offers suggested in Mr. Fernandez's pleading during this meeting or at any point thereafter.

27.     During this same vacation, I met with realtor Luigi Gallegos and I recall traveling with Mr. Gallegos to look at potential properties. I did not act on or make any offers. I did not enter any contracts in my personal capacity or on behalf of any business entities.

28.     On a subsequent visit to Florida for another family vacation, my family was joined by Chris Doyle. Mr. Doyle is my partner in other real estate ventures in Virginia. Mr. Doyle and Comeback Inn considered several properties, including the properties at 810, 814, and 820 Alton Road (collectively, the "Alton Road Property"). I did participate and advise Comeback Inn, and assisted it in engaging Florida legal counsel to represent it in a transaction.

29.     During that particular family trip to Florida where I was joined by Mr. Doyle, I recall meeting with Mr. Granda and either or both Mr. Fernandez and his father. This meeting took place at a Cuban restaurant over breakfast. Also present was realtor, Mr. Luigi Gallegos, and Mr. Doyle.

30.     At no point during this meeting or thereafter did I make the alleged offers or promises to Mr. Fernandez or anyone acting on Mr. Fernandez's behalf.

31.     Following that trip, Mr. Doyle continued to analyze business opportunities and corresponded with Mr. Gallegos.

32.     Comeback Inn contracted to purchase the Alton Road Property.

33.     Ultimately, Comeback Inn determined to not proceed with the transaction.

34.     Alton Hostel, LLC, was formed to assume that transaction and business opportunity.

35.     Alton Hostel did purchase the Alton Road Property and received a warranty deed from the seller, recorded with Miami-Dade County's Clerk of Court on February 22, 2013, Book 28502 Pages 1051-1052, a true and correct copy of which is attached here as **Exhibit A**. I was not a party to that transaction, as evidenced by the warranty deed.

36.     The Alton Road Property is encumbered by a mortgage held by Carter Bank & Trust, a bank based in Martinsville, Virginia. This mortgage is recorded with Miami-Dade County's Clerk of Court on March 8, 2013, Book 28522, Pages 2593-2605, a true and correct copy of which is attached here as **Exhibit B**. I am not a party to that mortgage, as evidenced by the attached mortgage.

37.     This mortgage secures a promissory note made by Alton Hostel to Carter Bank & Trust in the principal amount of $3,840,000. (Exhibit B at 2, ¶ 2(A)). I am not a maker of, or payor on, that promissory note.

## Alton Hostel, LLC

38.     I am not, and have never been, a member, owner, manager, officer, director, or executive of Alton Hostel.

39.     I have never been involved in the day-to-day operations of Alton Hostel.

40.     Alton Hostel engaged attorney, David Horvath, of the law firm Hurd, Horvath & Ross, P.A. of Palm Beach Gardens, Florida, to form the company and advise it in the purchase and financing of the Alton Road Property.

41.     With Mr. Horvath's assistance and service as registered agent, Alton Hostel was formed on or about February 7, 2013.

42.     At all pertinent times, my role was limited to counseling and advising Alton Hostel in acquisition of the business opportunity and closing of financing.

43.     At that time, I was licensed to practice law in Virginia. I am no longer an active member of the Virginia Bar Association and have converted my license to associate membership as I lack the time to both practice law and carry out my job responsibilities at the university.

44.     From time-to-time, the managers of Alton Hostel, my son, Trey Falwell, and Giancarlo Granda, contact me for advice based on my 20 years of real property legal practice and experience investing in and developing real estate. I am not paid for that advice.

45.     I have never charged, invoiced, or collected fees from, Alton Hostel.

46.     Alton Hostel has never paid a salary or wages to me.

47.     Alton Hostel has never paid any dividends or other equity-related distributions to me.

48.     The only three members that Alton Hostel has, Rebecca Falwell, Trey Falwell, and Giancarlo Granda, are the only three members the company has ever had.

49.     Alton Hostel has duly issued Schedule K-1 forms to each of its members for each year necessary. As I have never been a member, I have never received a Schedule K-1 from Alton Hostel.

50.     I have been informed that the respective ownership interests of Alton Hostel have never changed. In other words, Mr. Granda did not become an owner after the company's formation. Rather, per his agreement with my wife and son, he was an owner upon the formation of Alton Hostel in 2013.

51.     Alton Hostel, through its Florida legal counsel and registered agent, amended its governing documents in 2014 to remove Trey Falwell as a "managing member" and re-designate him as a "manager," and confirm Mr. Granda as a manager in a public-facing filing sufficient to facilitate Mr. Granda's duties. In so doing, Alton Hostel went from member-managed limited liability company to a manager-managed limited liability company. Nothing changed with regard to the equity interests of the members with that filing.

**Loans to Alton Hostel**

52.     My wife and I have made loans to Alton Hostel. Those loans, I have been informed, have been duly accounted for and booked as loans to Alton Hostel in its federal tax returns in each pertinent year.

53.     My wife and I provided a loan of $1 million for Alton Hostel's purchase of the Alton Property.

54.     Later, my wife and I provided additional funds of approximately $800,000 for renovations of the Alton Property which are being treated as an additional loan.

### Alleged Contract with Mr. Fernandez

55.     I never made the offers suggested and/or alleged in Mr. Fernandez's pleading or its exhibits.

56.     I would not, and did not, have any authority to negotiate on behalf of Alton Hostel with Mr. Fernandez.

57.     I have never had the power to bind Alton Hostel to any contract.

58.     I would not, and did not, have any authority to negotiate on behalf of Mr. Granda with Mr. Fernandez.

59.     I have never had the power to bind Mr. Granda to any contract.

60.     I have never had any right, power, or authority to affect, convey, split, assign, or otherwise redistribute any portion of Mr. Granda's membership interest in Alton Hostel.

61.     Mr. Granda's interest in the company was granted not in consideration for his identification of a business opportunity, or of an introduction to Jesus Fernandez, Sr., but rather in exchange for his agreement to serve as a local manager. Mr. Granda carried out his obligations, and I have personal knowledge that he managed difficult efforts to bring the Alton Property up to the standards of the applicable building, zoning, and other applicable codes and regulations of the City of Miami Beach. Mr. Granda also oversaw the approximately one-million-dollar renovation project.

62.     I never spoke with Jesus Fernandez, Jr., or any of his agents, regarding employment with Alton Hostel.

63.    I never spoke with Jesus Fernandez, Jr., or any of his agents, regarding equity interests in Alton Hostel.

### Ms. Faciolince and Mr. Bracho

64.    I do not recall ever meeting Jeannette Faciolince or Roberto Bracho.

65.    I have been shown pictures of these two individuals, true and correct copies of which are attached here as **Composite Exhibit C**, but I do not recognize either person.

66.    To my knowledge, neither Ms. Faciolince nor Mr. Bracho worked on the transaction for Alton Hostel.

67.    Even if they serviced the file for Doral Isles Real Estate, LLC, I do not recall meeting either person.

68.    I never visited the offices of Doral Isles Real Estate.

69.    I never participated in a meeting at Doral Isles Real Estate.

70.    The closing on the Alton Road Property took place remotely, not in person.

71.    To the extent, if any, that I participated in a telephone call with Mr. Luigi Gallegos, I was never informed that either Ms. Faciolince or Mr. Bracho were on the line. But I do not recall any telephone calls to or from Doral Isles Real Estate.

72.    I have been informed that Ms. Faciolince was the spouse of Luigi Gallegos.

73.    Indeed, in one e-mail from Mr. Luigi Gallegos to me, he had to explain Ms. Faciolince's identity.

74.    I did not make the statements attributed to me in the affidavits of Ms. Faciolince or Mr. Bracho.

75.     My interactions with realtors were limited to my role as an advisor to Comeback Inn and Alton Hostel, and to that end my only discussions were with the late Mr. Luigi Gallegos, the realtor who actually represented Alton Hostel, and the seller's realtor, Susan Gales.

76.     Mr. Luigi Gallegos wrote to identify that Ms. Faciolince was his spouse, and had her license with Doral Isles Real Estate. A true and correct copy of Mr. Gallegos's e-mail on this point is attached here as **Exhibit D**. While Mr. Gallegos was the listed realtor for this transaction, it might well be that he was communicating his relationship with Ms. Faciolince in order to credit the closing to her.

77.     I have since learned that four days after the settlement date of this transaction for the Alton Property, February 21, 2013, that the State of Florida charged Mr. Luigi Gallegos with grand theft, first degree, under section 812.014, Florida Statutes, on or about February 25, 2013.

78.     I have been shown the document attached as **Exhibit E** here, which I understand to be a judgment against Mr. Luigi Gallegos, finding him guilty of grand theft, first degree, under section 812.014, Florida Statutes.

### No Performance in Florida

79.     I am not a party to any contract requiring me to perform any obligation in Florida.

80.     I am not a party to any contract with Jesus Fernandez, Jr.

**FURTHER AFFIANT SAYETH NAUGHT.**


Under penalties of perjury, I declare that I have read the foregoing affidavit and the facts stated in it are true and correct to the best of my knowledge and recollection.

_____
Jerry Falwell, Jr.

SWORN TO and subscribed before me on this ___4th___ day of ~~November~~ *December*, 2018, Jerry Falwell, Jr., who is:

___✓ Personally known to me; or

___ Produced _____ as identification.

Notary Seal:

Notary Public

Amanda Gail Stanley
Commonwealth of Virginia
Notary Public
Commission No. 7529358
My Commission Expires 8/31/2020



CFN 2013R0146080
OR Bk 28502 Pgs 1051 - 1052; (2pgs)
RECORDED 02/22/2013 15:53:15
DEED DOC TAX 27,936.00
SURTAX 20,952.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA



Prepared by and return to:
David E. Horvath
Attorney at Law
Hurd, Horvath & Ross, P.A.
8295 N. Military Trail Suite A
Palm Beach Gardens, FL 33410
561-627-1534
File Number: FALWE001
Will Call No.:

_____[Space Above This Line For Recording Data]_____

## Warranty Deed

**This Warranty Deed** made this 21st day of February, 2013 between First American Exchange Company, LLC, as intermediary for Joe Comesana and Mercy Comesana, husband and wife whose post office address is 1630 West 22nd Street, Miami, FL 33140, grantor, and Alton Hostel, LLC, a Florida limited liability company whose post office address is 3200 Sunnymeade Road, Rustburg, VA 24588, grantee:

(Whenever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, trusts and trustees)

**Witnesseth**, that said grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in Miami-Dade County, Florida to-wit:

Lot 28, Block 3, of AMENDED PLAT OF FLEETWOOD SUBDIVISION, according to the Plat thereof, as recorded in Plat Book 28, Page 34, of the Public Records of Miami-Dade County, Florida.

Parcel Identification Number: 02-4203-001-0540

Subject to taxes for the current year and subsequent years, covenants, conditions, restrictions, easements, reservations and limitations of record, if any.

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**To Have and to Hold**, the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to December 31, 2012.

**In Witness Whereof**, grantor has hereunto set grantor's hand and seal the day and year first above written.

DoubleTimes

```
OR BK 28502 PG 1052
LAST PAGE
```

Signed, sealed and delivered in our presence:

Susy Martinez
_Signature_

Witness Name: _____

Witness Name: _____

Ketty Hernandez

_____(Seal)
Joe Comesana

_____(Seal)
Mercy Comesana

State of Florida
County of Miami-Dade

The foregoing instrument was acknowledged before me this 21st day of February, 2013, by Joe Comesana and Mercy Comesana, who [_] are personally known or [_] have produced a driver's license as identification.

[Notary Seal]

Notary Public _____

Printed Name: _____

My Commission Expires: _____

SUSETTE MARTINEZ
MY COMMISSION # EE 222915
EXPIRES: October 19, 2016
Bonded Thru Notary Public Underwriters

_Warranty Deed_ - Page 2

DoubleTimes

11/2/2018                              Miami-Dade Official Records - Print Document

CFN  2013R0183681
OR BK 28522 Pgs 2593 - 2605; (13pgs)
RECORDED 03/08/2013 14:04:52
MTG DOC TAX 13,440.00
INTANG TAX 7,680.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Record & Return to:
David E. Horvath, Esq.
Hurd, Horvath & Ross, P.A.
8295 N. Military Trail, Suite A
Palm Beach Gardens, FL 33410

Return to: Loan Department, Carter Bank & Trust, PO Box 3748, Martinsville, VA 24115
This document was prepared by: Loan Department, Carter Bank & Trust, PO Box 3748, Martinsville, VA 24115
State of Florida's Documentary Stamp Tax required by law in the amount of $ 13,440.00 has been paid to the
Clerk of the Circuit Court (or the County Comptroller, if applicable) for the County of Miami-Dade, State of Florida.

_____ Space Above This Line For Recording Data _____

# MORTGAGE
(With Future Advance Clause)

**DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is March 7th, 2013.  The parties and their
addresses are:

MORTGAGOR:
    ALTON HOSTEL, LLC
    A Florida Limited Liability Company
    3200 Sunnymeade Road,
    Rustburg, VA 24588

LENDER:
    CARTER BANK & TRUST
    Organized and existing under the laws of Virginia
    4 East Commonwealth Boulevard
    Martinsville, VA  24112-1920

**1. CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged,
and to secure the Secured Debts and Mortgagor's performance under this Security Instrument, Mortgagor does
hereby grant, bargain, convey and mortgage to Lender, the following described property:

The property is located in Miami-Dade County at 810, 814, & 820 Alton Road, Miami Beach, Florida, 33140 .
Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and
riparian rights, wells, ditches and water stock, crops, timber, all diversion payments or third party payments made

Alton Hostel, LLC
Florida Mortgage
VA/4FMF00140000000000000084052N          Wolters Kluwer Financial Services ©1996, 2013 Bankers Systems™          Page 1

https://www2.miami-dadeclerk.com/OfficialRecords/PrintDocument.aspx?QS=YaoUfOzxry1Y8p1kfXAMMqJq%2bC3kG9ObiRDgMb%2fGGc8KB5AR...   1/13

EXHIBIT B 1 of 13

to crop producers and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

**2. SECURED DEBTS AND FUTURE ADVANCES.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

**A. Specific Debts.** The initial indebtedness secured by this Security Instrument is the following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 20709, dated March 7^{TH}, 2013, from Mortgagor to Lender, with a loan amount of $3,840,000.00 and maturing on April 1, 2033.

**B. Future Advances.** All future advances made within 20 years from the date of this Security Instrument from Lender to Mortgagor under the Specific Debts executed by Mortgagor in favor of Lender after this Security Instrument. If more than one person signs this Security Instrument, each agrees that this Security Instrument will secure all future advances that are given to Mortgagor either individually or with others who may not sign this Security Instrument. All future advances are secured by this Security Instrument even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing. In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Mortgagor's principal dwelling that is created by this Security Instrument. This Security Instrument will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or limitations of Sections 19(a), 32, or 35 of Regulation Z.

**C. All Debts.** All present and future debts made within 20 years from the date of this Security Instrument from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Mortgagor's principal dwelling that is created by this Security Instrument. This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities. This Security Instrument will not secure any other debt if Lender fails, with respect to that other debt, to fulfill any necessary requirements or limitations of Sections 19(a), 32, or 35 of Regulation Z.

**D. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

**3. MAXIMUM OBLIGATION LIMIT; FUTURE ADVANCES.** The total principal amount secured by this Security Instrument at any one time and from time to time will not exceed $3,840,000.00. This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**4. PAYMENTS.** Mortgagor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

Alton Hostal, LLC
Florida Mortgage
VA/4FMF0014000000000000854052N                    Wolters Kluwer Financial Services ©1996, 2012 Bankers Systems™                    Page 2

EXHIBIT B 2 of 13

**5. WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell and mortgage the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

**6. PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:

    A. To make all payments when due and to perform or comply with all covenants.

    B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.

    C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**7. CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

**8. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

**9. TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation, partnership, limited liability company or other organization), Lender may demand immediate payment if:

    A. A beneficial interest in Mortgagor is sold or transferred.

    B. There is a change in either the identity or number of members of a partnership or similar entity.

    C. There is a change in ownership of more than 25 percent of the voting stock of a corporation, partnership, limited liability company or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

**10. WARRANTIES AND REPRESENTATIONS.** Mortgagor makes to Lender the following warranties and representations which will continue as long as this Security Instrument is in effect:

    A. **Power.** Mortgagor is duly organized, and validly existing and in good standing in all jurisdictions in which Mortgagor operates. Mortgagor has the power and authority to enter into this transaction and to carry on Mortgagor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Mortgagor operates.

    B. **Authority.** The execution, delivery and performance of this Security Instrument and the obligation evidenced by this Security Instrument are within Mortgagor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Mortgagor is a party or to which Mortgagor is or any of Mortgagor's property is subject.

    C. **Name and Place of Business.** Other than previously disclosed in writing to Lender, Mortgagor has not changed Mortgagor's name or principal place of business within the last 10 years and has not used any other

Alton Hostel, LLC
Florida Mortgage
VA/4FMF00140000000000000054052N

Wolters Kluwer Financial Services ©1996, 2013 Bankers Systems™

Page 3

https://www2.miami-dadeclerk.com/OfficialRecords/PrintDocument.aspx?QS=YaoUfOzxry1Y8p1kfXAMMqJq%2bC3kG9ObiRDgMb%2fGGc8KB5AR...     3/13

EXHIBIT B 3 of 13

trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve Mortgagor's existing name, trade names and franchises.

**11. PROPERTY CONDITION, ALTERATIONS, INSPECTION, VALUATION AND APPRAISAL.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor will not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time and frequency for the purpose of inspecting, valuating, or appraising the Property. Lender will give Mortgagor notice at the time of or before an on-site inspection, valuation, or appraisal for on-going due diligence or otherwise specifying a reasonable purpose. Any inspection, valuation or appraisal of the Property will be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection, valuation or appraisal for its own purpose, except as otherwise provided by law.

**12. AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

**13. ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys and mortgages to Lender as additional security all the right, title and interest in the following (Property).

   A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to any extensions, renewals, modifications or replacements (Leases).

   B. Rents, issues and profits, including but not limited to security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as

Alton Hostel, LLC
Florida Mortgage
VAH4PMF001400000000000654052N                       Wolters Kluwer Financial Services ©1996, 2013 Bankers Systems™                    Page 4



https://www2.miami-dadeclerk.com/OfficialRecords/PrintDocument.aspx?QS=YaoUfOzxry1Y8p1kfXAMMqJq%2bC3kG9QbIRDgMb%2fGGc8KB5AR...      4/13

EXHIBIT B 4 of 13

Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs in writing, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting, valuating, appraising and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment. As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance. Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

**14. DEFAULT.** Mortgagor will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

A. **Payments.** Mortgagor fails to make a payment in full when due.

B. **Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Mortgagor, Borrower, or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

C. **Business Termination.** Mortgagor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

D. **Failure to Perform.** Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

E. **Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

F. **Other Agreements.** Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

G. **Misrepresentation.** Mortgagor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

H. **Judgment.** Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

I. **Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

J. **Name Change.** Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

Alton Hostel, LLC
Florida Mortgage
VA%PMR001400000000000685052N

Wolters Kluwer Financial Services ©1996, 2013 Bankers Systems™                Page 5



EXHIBIT B 5 of 13

**K. Property Transfer.** Mortgagor transfers all or a substantial part of Mortgagor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

**L. Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying Lender, there is a material change in Mortgagor's business, including ownership, management, and financial conditions.

**N. Insecurity.** Lender determines in good faith that a material adverse change has occurred in Mortgagor's financial condition from the conditions set forth in Mortgagor's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**15. REMEDIES.** On or after the occurrence of an Event of Default, Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts. Any amounts advanced on Mortgagor's behalf will be immediately due and may be added to the balance owing under the Secured Debts. Lender may make a claim for any and all insurance benefits or refunds that may be available on Mortgagor's default.

Subject to any right to cure, required time schedules or any other notice rights Mortgagor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of an Event of Default or anytime thereafter.

All remedies are distinct, cumulative and not exclusive, and Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**16. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, Mortgagor agrees to pay all expenses of collection, enforcement, valuation, appraisal or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Mortgagor agrees to pay expenses for Lender to inspect, valuate, appraise and preserve the Property and for any recordation costs of releasing the Property from this Security Instrument. Expenses include, but are not limited to, attorneys' fees of 10 percent of the Principal sum due or a larger amount as the court judges as reasonable and just, court costs and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Mortgagor.

**17. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as

Alton Hostel, LLC
Florida Mortgage
VA/4PMF00140000000000000684082H                Wolters Kluwer Financial Services ©1998, 2013 Bankers Systems™        Page 6

https://www2.miami-dadeclerk.com/OfficialRecords/PrintDocument.aspx?QS=YaoUfOzxry1Y8p1kfXAMMqJq%2bC3kG9ObIRDgMb%2fGGc8KB5AR...      6/13

EXHIBIT B 6 of 13

"hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return



Mortgagor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**18. CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**19. INSURANCE.** Mortgagor agrees to keep the Property insured against the risks reasonably associated with the Property. Mortgagor will maintain this insurance in the amounts Lender requires. This insurance will last until the Property is released from this Security Instrument. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debts. Mortgagor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

All insurance policies and renewals shall include a standard "mortgage clause" (or "lender loss payable clause") endorsement that names Lender as "mortgagee" and "loss payee". If required by Lender, all insurance policies and renewals will also include an "additional insured" endorsement that names Lender as an "additional insured". If required by Lender, Mortgagor agrees to maintain comprehensive general liability insurance and rental loss or business interruption insurance in amounts and under policies acceptable to Lender. The comprehensive general liability insurance must name Lender as an additional insured. The rental loss or business interruption insurance must be in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing).

Mortgagor will give Lender and the insurance company immediate notice of any loss. All insurance proceeds will be applied to restoration or repair of the Property or to the Secured Debts, at Lender's option. If Lender acquires the Property in damaged condition, Mortgagor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Mortgagor will immediately notify Lender of cancellation or termination of insurance. If Mortgagor fails to keep the Property insured, Lender may obtain insurance to protect Lender's interest in the Property and Mortgagor will pay for the insurance on Lender's demand. Lender may demand that Mortgagor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include coverages not originally required of Mortgagor, may be written by a company other than one Mortgagor would choose, and may be written at a higher rate than Mortgagor could obtain if Mortgagor purchased the insurance. Mortgagor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

**20. ESCROW FOR TAXES AND INSURANCE.** Mortgagor will pay to Lender amounts for (a) yearly taxes and assessments on the Property which under the law may be superior to this Security Instrument, (b) yearly leasehold payments or ground rents (if any), (c) yearly premiums for hazard or property insurance, (d) yearly premiums for flood insurance (if any), and (e) yearly premiums for mortgage insurance (if any). Mortgagor will pay those amounts to Lender unless Lender tells Mortgagor, in writing, that Mortgagor does not have to do so, or unless the law requires otherwise. Mortgagor will make those payments at the times required by Lender.

Alton Hostel, LLC
Florida Mortgage

VA/4FMR001400000000000084052N              Wolters Kluwer Financial Services ©1996, 2013 Bankers Systems™                    Page 8



Lender will estimate from time to time Mortgagor's yearly taxes, assessments, leasehold payments or ground rents and insurance premiums, which will be called the Escrow Items. The amounts that Mortgagor pays to Lender for Escrow Items under this section will be called the Funds.

Lender will keep the Funds in a savings or banking institution which has its deposits or accounts insured or guaranteed by a federal or state agency. If Lender is such an institution, Lender may hold the Funds. Lender will use the Funds to pay the Escrow Items.

Lender will not be required to pay Mortgagor any interest or earnings on the Funds unless either (i) Lender and Mortgagor agree in writing, at the time Mortgagor signed this Security Instrument, that Lender will pay interest on the Funds; or (ii) the law requires Lender to pay interest on the Funds.

If the amount of the funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may notify Mortgagor in writing, and, in such case, Mortgagor shall pay to Lender the amount necessary to make up the shortage or deficiency. Mortgagor shall make up the shortage or deficiency as Lender directs, subject to the requirements of applicable law.

If, by reason of any default under this Security Instrument, Lender declares all Secured Debts due and payable, Lender may then apply any Funds against the Secured Debts.

When Mortgagor has paid all of the sums secured, Lender will promptly refund to Mortgagor any Funds that are being held by Lender.

**21. WAIVERS.** Except to the extent prohibited by law, Mortgagor waives all appraisement and homestead exemption rights relating to the Property.

**22. FIXTURE FILING.** Mortgagor gives to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

**23. PERSONAL PROPERTY.** Mortgagor gives to Lender a security interest in all personal property located on or connected with the Property, including all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property (all of which shall also be included in the term Property). The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

**24. APPLICABLE LAW.** This Security Instrument is governed by the laws of Florida, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**25. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Mortgagor's obligations under this Security Instrument are independent of the obligations of any other Mortgagor. Lender may sue each Mortgagor individually or together with any other Mortgagor. Lender may release any part of the Property and Mortgagor will still be obligated under this Security Instrument for the remaining Property. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Mortgagor.

**26. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing and executed by Mortgagor and Lender. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument

Aitch Hostel, LLC
Florida Mortgage

VA/4PMF0014000000000000654092N                    Wolters Kluwer Financial Services ©1996, 2013 Bankers Systems™          Page 9

11/2/2018
Miami-Dade Official Records - Print Document

is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**27. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

**28. NOTICE, ADDITIONAL DOCUMENTS AND RECORDING FEES.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Mortgagor will be deemed to be notice to all Mortgagors. Mortgagor will inform Lender in writing of any change in Mortgagor's name, address or other application information. Mortgagor will provide Lender any other, correct and complete information Lender requests to effectively mortgage or convey the Property. Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Security Instrument. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and to confirm Lender's lien status on any Property, and Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**SIGNATURES.** By signing under seal, Mortgagor agrees to the terms and covenants contained in this Security Instrument. Mortgagor also acknowledges receipt of a copy of this Security Instrument.

MORTGAGOR:

Alton Hostel, LLC, a Florida Limited Liability Company

By _____ Date March 7th 2013 (Seal)
Jerry L. Falwell, III,
a/k/a Trey Falwell, Manager

_____ Date March 7, 2013
(Witness)
MARK GREASY II

Alton Hostel, LLC
Florida Mortgage
VA/4FM/R0014000000000000854052N          Wolters Kluwer Financial Services ©1996, 2013 Bankers Systems™          Page 10

Book28522/Page2602     CFN#20130183681          Page 10 of 13

https://www2.miami-dadeclerk.com/OfficialRecords/PrintDocument.aspx?QS=YaoUfOzxry1Y8p1kfXAMMqJq%2bC3kG9ObiRDgMb%2fGGc8KB5A...     10/13

EXHIBIT B 10 of 13

11/2/2018                                    Miami-Dade Official Records - Print Document

ACKNOWLEDGMENT:
State of Virginia
County of Lynchburg
City

The foregoing instrument was sworn to and subscribed before me this 7th day of March, 2013 Jerry L. Falwell, III, a/k/a Trey Falwell, Managing Member of Alton Hostel, LLC, a Florida limited liability company , on behalf of the limited liability company. He/[_] is personally known to me or [_] has produced a driver's license as identification.

[Notary Seal]

Notary Public

Printed Name: Amanda Gail Stanley

My Commission Expires: 8/31/2016

Amanda Gail Stanley
Commonwealth of Virginia
Notary Public
Commission No 7529358
My Commission Expires 8/31/2016

Book28522/Page2603     CFN#20130183681          Page 11 of 13

EXHIBIT B 11 of 13

11/2/2018
Miami-Dade Official Records - Print Document

## EXHIBIT "B" TO MORTGAGE/DEED OF TRUST

### Environmental Matters

i.     The term "Environmental Laws" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, surface water, ground water, land surface or subsurface strata), including without limitation, laws relating to emissions, or discharges, releases or threatened releases of chemicals, pollutants, contaminants, or industrial, radioactive, toxic or hazardous substances or wastes into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, recycling, disposal, transport or handling of chemicals, pollutants, contaminants, or industrial, radioactive toxic or hazardous substances or wastes, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders permits, plans or regulations issued, entered promulgated or approved thereunder.

ii.     To the Grantor's knowledge after due investigation, the Grantor has obtained or is in the process of obtaining all permits, licenses and other authorizations under the Environmental Laws, and has filed all notifications that are required, with respect to the operation of the property under the Environmental Laws.

iii.     To the Grantor's knowledge after due investigation, the Grantor is in compliance with, and no third person has committed any act which has resulted in non-compliance with, all terms and conditions, limitations, obligations, prohibitions, requirements, restrictions, schedules, standards and timetables contained in the Environmental Laws.  The Grantor has not received written communication, whether from governmental authorities, citizens' groups, environmental consultants or otherwise, that alleges that the Grantor is not in such compliance.

iv.     To the Grantor's knowledge after due investigation, there is no civil, criminal or administrative action, claim, demand, demand letter, hearing, investigation, notice, notice letter, notice of violation, proceeding or suit pending or threatened against the Grantor, the Grantor's assets or properties relating to alleged violations of the Environmental Laws.

v.     To the Grantor's knowledge after due investigation, there are no present or past Environmental Conditions in any way relating to the Property. "Environmental Conditions" means the introduction into the environment of any pollution, including without limitation any contaminant, irritant or pollutant or other hazardous substance (whether or not upon the Property and whether or not such pollution constituted at the time thereof a violation of any Environmental Laws as a result of any release of any kind whatsoever of any hazardous substance as defined in the Environmental Laws) as a result of which the Grantor has or may become liable to any third party or by reason of which any property of the Grantor or be subject to any lien.

vi.     To the Grantor's knowledge after due investigation, there is not now and has not been at any time in the past any installation, use, maintenance, repair testing, closure or removal of any underground or above-ground storage tank or pipeline that was not in compliance with all Environmental Laws and there has been no release from or rupture of any such tank or pipeline, including without limitation any release from or in connection with the filling or emptying of such tank.

vii.     Grantor agrees to indemnify and hold Carter Bank & Trust and its successors and assigns completely harmless from any and all present or future liability pertaining to the existence, presence or release of any hazardous substances as defined in the Environmental Laws on or adjacent to the real property described in the Mortgage/Deed of Trust or in Exhibit "A" attached thereto.

INITIAL

OR BK 28522 PG 2605
LAST PAGE

EXHIBIT "A"
LEGAL DESCRIPTION

Lot 28, Block 3, of AMENDED PLAT OF FLEETWOOD SUBDIVISION, according to the Plat thereof, as recorded in Plat Book 28, Page 34, of the Public Records of Miami-Dade County, Florida.

Book28522/Page2605     CFN#20130183681          Page 13 of 13

*Composite Exhibit C*





**From:** David Horvath
**Sent:** Friday, October 19, 2018 4:24 PM
**To:** Joanne Mapes
**Subject:** FW: Miami hostel

**From:** Dave Horvath <██████ @hurdlaw.com>
**Sent:** Friday, November 09, 2012 11:16 AM
**To:** 'Jerry Falwell' ██████████
**Subject:** RE: Miami hostel

Thank you.

**From:** Jerry Falwell ██████████
**Sent:** Thursday, November 08, 2012 9:45 PM
**To:** ██████ @hurdlaw.com
**Subject:** FW: Miami hostel

fyi

**Jerry Falwell, Jr. '84**
*Chancellor and President*
**Office of the President**



LIBERTY
U N I V E R S I T Y.

*Liberty University | Training Champions for Christ since 1971*

**From:** luigi gallegos ██████████ @gmail.com]
**Sent:** Thursday, November 08, 2012 5:19 PM
**To:** Jerry Falwell
**Subject:** Re: Miami hostel

Dear Mr Falwell
Is very nice to conduct business with a gentleman . for the record Jeannette Faciolince is not
part of Majestic Properties Susan Gale Office. She (Jeannette) is my wife and has her license
with Doral Isles Real estate for the record our commissions means Susan and Luigi i believe
Susan has the agreement with the seller to be 6 %,
Best Regards

Luigi Gallegos

On Thu, Nov 8, 2012 at 4:49 PM, Jerry Falwell ██████████ wrote:

Hey Luigi, Joe told me a few weeks ago to communicate with him directly so I sent him a new LOI.  He is reviewing but has not yet accepted.  See attached.

I hope you are doing well.

**Jerry Falwell, Jr. '84**
*Chancellor and President*
**Office of the President**

Fla.R.J.Admin 2.425
Redaction



*Liberty University | Training Champions for Christ since 1971*

**From:** luigi gallegos Fla.R.J.Admin 2.425 Redaction @gmail.com]
**Sent:** Thursday, November 08, 2012 1:35 PM

**To:** Fla.R.J.Admin 2.425 Redaction
**Subject:** Re: Miami hostel

DEAR JERRY HOPE EVERYTHING IS O.K. ANY UP-DATE WITH THE  CONTRACT.???

On Wed, Oct 31, 2012 at 6:19 AM, luigi gallegos < Fla.R.J.Admin 2.425 Redaction @gmail.com> wrote:

here is the note from jerry

 the house is not listed on the ml.s.

---------- Forwarded message ----------
From: **Jerry Falwell** Fla.R.J.Admin 2.425 Redaction
Date: Fri, Oct 26, 2012 at 8:36 PM
Subject: RE: Miami hostel
To: luigi gallegos < Fla.R.J.Admin 2.425 Redaction @gmail.com>

Nothing really to report, Luigi, but I will let you know if a contract is executed.  Thank you!

**Jerry Falwell, Jr. '84**
*Chancellor and President*
**Office of the President**

Fla.R.J.Admin 2.425
Redaction



*Liberty University | Training Champions for Christ since 1971*

**From:** luigi gallegos <Fla R J Admin 2.425 Redaction @gmail.com]
**Sent:** Friday, October 26, 2012 7:23 PM

**To:** Fla.R.J.Admin 2.425 Redaction
**Subject:** Re: Miami hostel

no please if you need me reply via e mail

On Fri, Oct 26, 2012 at 7:16 PM Fla R J.Admin.2 425 Redaction < Fla R J.Admin.2 425 Redaction > wrote:

I texted you earlier, luigi.  Let me know if you did not receive it please.  Thanks

Sent from my Verizon Wireless Phone

--- Original Message ---

From: luigi gallegos < Fla R J Admin 2.425 Redaction @gmail.com>
Sent: October 26, 2012 10/26/12
To: susan gale < Fla R J Admin 2.42 Redaction @mac.com>

Cc: "Doyle, Chris" < Fla R J.Admin.2.425 Redaction >, susan gale < Fla R J Admin 2.42 5 Redaction @me.com>, Susan Gale < Fla.R.J. Admin @susangalegroup.com>, Jerry Falwell < Fla R J.Admin 2.425 Redaction >, Ada Azarya < Fla R J. 25 Redaction @yahoo.com>

Subject: Re: Miami hostel

To All

I appreciate if you kindly reply to me we the up-date formation about the negotiations on this property

Luigi Gallegos

On Wed, Aug 29, 2012 at 11:49 AM, susan gale <​[Fla.R.J.Admin.2.425 Redaction]​@mac.com> wrote:

Ok Chris , I know you must  do what you must.   Does that mean it will be a few weeks before you can address the Miami hostel deal?  I just want to be clear so I can communicate this to joe. Thanks , susan

Sent from my iPhone

On Aug 29, 2012, at 10:31 AM, "Doyle, Chris" <​[Fla.R.J.Admin.2.425 Redaction]​> wrote:

Thank you Susan, I promise you and Joe that will come down there in September and welcome the opportunity to wrap this up face to face.  I agree that the feelings between the buyer and seller are very comfortable and look forward to concluding it, one way or the other,  on that basis.  In order to avoid any misunderstandings or false starts, I must be totally knowledgeable about what we are engaging in via the information you are providing as well as my own recon, which I am at a disadvantage given the distance and prior unfamiliarity with your market.

When it rains, it pour….as luck would have it, there are several brokerage dealings I worked on this summer that received a green light last week from my clients.  This matter  is important for us to conclude, but with over $20 million now going hard, I need to primarily focus on serving these clients for the next few weeks during their DD period, while finishing my background on the hostel numbers and then I can give Joe and Jerry the attention this deserves without other distractions.  First come, first served, but the goal is to get them all done to everyone's satisfaction.

Christopher R. Doyle | Vice President
CBRE | Richmond | Retail Services
[Fla.R.J.Admin.2.425 Redaction] | Richmond, VA 23230
T + [Fla.R.J.Admin.2.425 Redaction] | F + [Fla.R.J.Admin.2.425 Redaction] | C + [Fla.R.J.Admin.2.425 Redaction]
[Fla.R.J.Admin.2.425 Redaction]

Please consider the environment before printing this email.

This message and any attachments may be privileged, confidential or proprietary. If you are not

the intended recipient of this email or believe that you have received this correspondence in error, please contact the sender through the information provided above and permanently delete this message.

From: susan gale [mailto:▮▮▮▮▮▮▮▮@me.com]
Sent: Wednesday, August 29, 2012 10:01 AM
To: Doyle, Chris; Susan Gale
Cc: luigi gallegos; Jerry Falwell; Susan Gale; Ada Azarya
Subject: Re: Miami hostel

Hi Chris, I understand your points. I guess everyone can look at the market differently based on many factors. There is a lot of research supporting the positive growth of the hospitality industry in Miami and Miami beach . I am looking at from my perspective and the incredible demand that we have. I know that There were quite a few forclosures over the last 3 years . It seems that we are at the end of the forclosure wave.

I also understand that joes expenses will differ from yours . I will explain that to him so that he fully understands your position. . I truly believe that a face to face meeting with joe to disuss this and other points that impact your decision as far as the price , that you need to justify , would be the best way to come to a mutually acceptable agreement by all parties . Let's try to set this up. I know that joe feels very comfortable with you and Jerry,; he just has a great feeling .

I truly respect that fact that you are doing your due diligence up front,so as to not waste everyone's time . That is not the usual . It makes all of us even

more comfortable

We will forward the monthly income for June ,July and August

Let me know if there is anything else you need

Have a Great day,  best regards, susan gale

5V3DT8VN
Sent from my iPad

On Aug 29, 2012, at 9:31 AM, "Doyle, Chris" <■■■■■@cbre.com> wrote:

Thank you for your email last night Susan, I appreciate the update and prior rent number.  It does not factor into our price with Joe since we are buying a going concern, but there will be an allocation of the price between the real estate and buying the business for tax purposes and the rent number will help justify it.

My original requested the sales for June, July as well as the partial month of August along with the corresponding occupancy rate.  Please provide and I will advise if there is any further interest.

I appreciate your views on how hot the Miami Beach RE market is, however, my recon is proving otherwise.  There are currently 7 hotel properties on the verge of foreclosure between 22nd street and 5th.  Mostly on the Eastside of Miami Beach near Collins and Ocean.  If Joe wants to take it off the market then I cannot control that and it is his prerogative.  I just need to be comfortable with the  income and expense costs in order to make a deal we can perform on this sale.  I am not at that point since Joe pays his people cash with no withholding, some of them live there as part of their compensation, the taxes will double or possible triple once this goes to record, insurance for hostel liability issues is substantially more than just the Fire Insurance he has on the building.  It appears the expense side costs could be double what they are currently running for Joe.   Again, this is not Joe's problem, but it would be ours, and if it does not make sense going in for us, then it is a mute point and I do not want to take any more of your time in this matter or waste Jerry's money on due diligence for something that will not work.  When we make acceptable offers, we close because of the work we do up front.  Due Diligence in the past has only been to confirm what we understood going in.

On the income side, based on the numbers I have from various sources including Joe, there is

only one slamming month-March, along with Memorial Day week, 4th of July week and Labor Day week.  Other than that, the occupancy and rates are lower.  I am still trying to justify the $4.5 million offer we made and not there yet.

Luigi, thank you for your offer to provide your contract and addendum, but we have a hotel contract that was drafted by a profession in these matters and will utilize it, if we can agree on a final price with Joe in the future.

I must be in Charlottesville and DC the next few days on my brokerage business dealings, but will respond once I get the complete information requested above.

Thank you for your continued efforts in this matter.

Christopher R. Doyle | Vice President
CBRE | Richmond | Retail Services
████████████████████ | Richmond, VA 23230
████████████████████
████████████████████

Please consider the environment before printing this email.

This message and any attachments may be privileged, confidential or proprietary. If you are not the intended recipient of this email or believe that you have received this correspondence in error, please contact the sender through the information provided above and permanently delete this message.

From: luigi gallegos [████████████@gmail.com]
Sent: Wednesday, August 29, 2012 8:00 AM
To: susan gale
Cc: Doyle, Chris; Jerry Falwell; Susan Gale; Ada Azarya
Subject: Re: Miami hostel

Good Morning

i want to express my gratitude for the way you have handle this with prompt attention to the matter. I agree that the market has improve very rapidly in the past weeks, i also have 2 cases where the sellers have decided not to sell.. i have he draft commercial contract ready to be send since in Florida we have such draft contract that does not required lawyer's.

after the contract is submitted  to  the seller he is the one that will create addendum's subject to the buyer's approval and then the buyers will be if they wantt submited the contract to  his lawyer's for final approval

Best Regards

Luigi Gallegos

On Tue, Aug 28, 2012 at 10:07 PM, susan gale < ██████████ @me.com> wrote:

Hi all, I just wanted to urge you to act as quickly as possible if you would like to proceed with the Miami hostel.   The market is so strong in miami, that many sellers are on the fence about selling ; and they change their minds or raise the price . This has recently happened to us on a few other deals  Joe is making a very good income from the hostel in addition to the income from the

retail component of the property. He is committed to,selling the hostel to you at this time.   It's a great property and there is very little out there    He is also willing to give you everything related to the hostel and the name "Miami hostel"

he is also happy to meet with you personally to discuss anything you want and / or to wrap Up this deal

Best regards, susan gale

Sent from my iPad


--
luigi gallegos




--
luigi gallegos


--
luigi gallegos



....
luigi gallegos




--
luigi gallegos

--
luigi gallegos

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

**153**

| DIVISION | JUDGMENT | |
|---|---|---|
| ☒ CRIMINAL | ☐ Probation Violator | ☐ Retrial |
| ☐ OTHER | ☐ Community Control Violator | ☐ Resentence |

**THE STATE OF FLORIDA     VS. LUIGI GALLEGOS**

**PLAINTIFF          DEFENDANT**

**CASE NUMBER:** F13-4574

**CLOCK IN**

The Defendant, _____ LUIGI GALLEGOS _____, being personally before this Court represented by _____ C. LYONS P.A _____, his attorney of record, and the State represented by _____ T. THOMAS _____, Assistant State's Attorney, and having:

☐ been tried and found guilty   ☒ entered a plea of guilty   ☐ entered a plea of nolo contendere

to the following crime(s):

☒ DNA NOT TAKEN

| COUNT | CRIME | OFFENSE STATUTE NO. | DEGREE OF CRIME | OBTS NO. |
|---|---|---|---|---|
| 1 | GRAND THEFT FIRST DEGREE | 812.014(2)(A) 812.014(1) | 1F | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

and no cause being shown why the Defendant should not be adjudicated guilty, IT IS ORDERED THAT the Defendant is hereby ADJUDICATED GUILTY of the above crime(s).

Clerk's web address: www.miami-dadeclerk.com          Page 1 of 3

CLKCT 401   REV. 8/07

DS 9/12/14

Bk 29387 Pg 4530 CFN 20140782867 11/13/2014 09:42:57 Pg 1 of 3 Mia-Dade Cty, FL

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
| --- | --- | --- |
| ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |

| DIVISION | CHARGES/COSTS/FEES | CASE NUMBER |
| --- | --- | --- |
| ☒ CRIMINAL | | F13-4574 |
| ☐ OTHER | | |

| THE STATE OF FLORIDA VS. | LUIGI GALLEGOS | CLOCK IN |
| --- | --- | --- |
| PLAINTIFF | DEFENDANT | |

The Defendant is hereby ordered to pay the following sum if checked:

☒ Fifty dollars **($50.00)** pursuant to F.S. 775.083(2) (Crime Prevention Fund {Ord. 98-171}

☒ Five dollars **($5.00)** pursuant to F.S. 938.01(1)/938.15 (County/State {LETTF}

☒ Fifty dollars **($50.00)** pursuant to F.S. 938.03(4) (Crime Compensation Trust Fund (CCA)

☒ Two hundred and twenty-five dollars **($225.00)** pursuant to F.S. 938.05(1) (Local Criminal Justice Trust Fund)

☒ Sixty-five dollars **($65.00)** pursuant to F.S. 939.185(1)(a) (Add'l Court Costs {Ord. 04-116})

☒ Eighty-five dollars **($85.00)** pursuant to F.S. 939.185(1)(b) (Surcharge {Ord. 05-123}

☒ Three dollars **($3.00)** pursuant to F.S. 938.19(2) (Teen Court {Ord. 98-185}

☒ One hundred dollars **($100.00)** pursuant to F.S. 938.27(8) (Cost of Prosecution)

☒ A sum of **$20.00** pursuant to F.S. 938.06 (Crime Stopper's Program)

☐ Fifty dollars ($50.00) pursuant to F.S. 27.52(1)(b) (Public Defender Application Fee)

☐ One hundred dollars ($100.00) pursuant to F.S. 938.29 (Cost of Defense)

☐ A sum of _____ pursuant to F.S. 775.083(1) (Fine)

☐ A sum of _____ pursuant to F.S. 938.04 (Surcharge 5% of Fine)

☐ A sum of $500.00 pursuant to F.S 796.07(6) (Prostitution Civil Penalty)

☐ A sum of $201.00 pursuant to F.S 938.06 (Domestic Violence Surcharge)

☐ A sum of $151.00 pursuant to F.S. 938.085 (Rape Crisis Trust)

☐ A sum of $151.00 pursuant to F.S. 938.10(1) (Child Advocacy Trust)

☒ A sum of $100.00 pursuant to F.S. 938.25 (FDLE Operation Trust Fund)

☐ A sum of _____ pursuant to F.S. 938.21 (Alcohol & Drug Abuse)

Other TOTAL: $703.00 _____

DONE AND ORDERED in Open Court in Miami-Dade County, Florida this 12th day of AUGUST, 20 14.

JUDGE SAMANTHA RUIZ-COHEN

CLK/CT 413 Rev. 11/11          Page 2 of 3          Clerk's web address: www.miami-dadeclerk.com

Bk 29387 Pg 4531 CFN 20140782867 11/13/2014 09:42:57 Pg 2 of 3 Mia-Dade Cty, FL

EXHIBIT E 2 of 3

☑ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

**DIVISION**
☑ CRIMINAL
☐ OTHER

**FINGERPRINTS OF DEFENDANT**

THE STATE OF FLORIDA    VS. *Gingi Sallegas*

PLAINTIFF          DEFENDANT

CASE NUMBER: *F13.4874*

CLOCK IN

I herby certify that the foregoing fingerprints on this judgment are the fingerprints of the defendant named above, and that they were placed thereon by said defendant in my presence, in open court, on this date and that the defendant provided the below Social Security Number or was unable to provide said number as indicated.

**FILED**
AUG 1 2 2014
CLE...

Fingerprints taken by: *M. Thompson COI*
                        Name              Title

## FINGERPRINTS OF DEFENDANT

| 1. R. Thumb | 2. R. Index | 3. R. Middle | 4. R. Ring | 5. R. Little |
|---|---|---|---|---|
|  |  |  |  |  |

| 1. L. Thumb | 2. L. Index | 3. L. Middle | 4. L. Ring | 5. L. Little |
|---|---|---|---|---|
|  |  |  |  |  |

**Social Security Number of Defendant** _____

DONE AND ORDERED in Open Court in Miami-Dade County, Florida this _____ day of AUG 1 2 2014 , 20 ____

                                        JUDGE
Page _3_ of _3_        SAMANTHA RUIZ-COHEN

CLK/CT 854 REV. 7/03          Clerk's web address: www.miami-dadeclerk.com

Bk 29387 Pg 4532 CFN 20140782867 11/13/2014 09:42:57 Pg 3 of 3 Mia-Dade Cty, FL